# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

BRANDEN HOLLOWAY

            v.   CASE NO. 3:11cv1290(VLB)

DEP'T OF CORRECTIONS, ET AL.   SEPTEMBER 10, 2013

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

  The plaintiff, Brandon Holloway, is currently confined at Corrigan-Radgowski Correctional Institution ("Corrigan") in Uncasville, Connecticut. In August 2011, he filed a civil rights action *pro se* pursuant to 28 U.S.C. § 1915 asserting claims under 42 U.S.C. § 1983 against the Department of Correction, Lieutenant Provencher and five John Doe defendants. On March 8, 2012, the court dismissed the claims against the Department of Correction, all claims against the remaining defendants in their official capacities and directed the plaintiff to file an amended complaint identifying the Doe defendants. On April 17, 2012, the plaintiff filed an Amended Complaint *pro se* asserting claims under 42 U.S.C. § 1983 as well as state law claims against Correctional Officers Cavallo, Mastroianni, Howard, Cote and Carroll and Lieutenant Provencher.

  Defendants have moved for summary judgment as to all claims against them. The plaintiff has filed a response to the motion. For the reasons that follow, the motion will be denied in part and granted in part.

1

**I.      Standard of Review**

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  *See* Rule 56(c),  Fed. R. Civ. P.; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The moving party may satisfy this burden by demonstrating the lack of evidence to support the nonmoving party's case.  *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

"Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2).  An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it.  *Anderson*, 477 U.S. at 248. "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or present mere

speculation or conjecture. *See Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (quotations and citations omitted). The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for him. *See Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, however, summary judgment is improper. *See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

Where one party is proceeding *pro se*, the court reads the *pro se* party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Despite this liberal interpretation, however, an unsupported assertion cannot overcome a properly supported motion for summary judgment. *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

II. Facts[1]

The plaintiff has been in the custody of the Department of Correction on state criminal charges since at least November 29, 2005. The plaintiff's Inmate

---

[1] The facts are taken from defendants' Local Rule 56(a)1 Statement, the exhibits and affidavits attached to the Memorandum in Support of the Motion for Summary Judgment and the Affidavit of Lieutenant Provencher attached to the Defendants' Reply Brief as well as the plaintiff's Local Rule 56(a)2 Statement, the plaintiff's Affidavit and the Exhibits attached to plaintiff's Memorandum in Opposition to Motion for Summary Judgment. (*See* Docs. Nos. 44-1 through 44-14, 51-1 through 51-53 and 52.)

**Movement History reflects that the plaintiff was sentenced in state court on February 2, 2007, July 6, 2007, August 2, 2007 and January 13, 2009. As of January 2009, the plaintiff was incarcerated at Cheshire Correctional Institution in Cheshire, Connecticut ("Cheshire"). Prior to the incident that occurred on June 2, 2010, Department of Correction officials had disciplined the plaintiff for fighting on three occasions, security tampering on three occasions, assaulting staff on one occasion, threats on one occasion and disobeying a direct order on three occasions.**

**During his tour of North Block at Cheshire on June 2, 2010, the defendant corrections officer Provencher observed Inmate Vivo pulling an extension cord through the vent. He ordered Inmate Vivo to exit his cell and to sit in the dayroom. Defendant Provencher then went to the upper tier to the plaintiff's cell which was directly above Inmate Vivo's cell. Defendant Provencher observed the plaintiff trying to pull something out of the vent, opened the plaintiff's cell door and asked him to go downstairs to the dayroom where Inmate Vivo was waiting.**

**When defendant Provencher reached the day room, he told the plaintiff and Inmate Vivo that he was sending them both to segregation for interfering with safety and security. Inmate Vivo took full responsibility for the extension cord being in the vent and insisted that the plaintiff did not know about it. Defendant Provencher indicated that it did not matter because he observed the plaintiff "in the vent."**

**Defendant Provencher ordered defendant Howard to handcuff the plaintiff behind his back and to stand him up against the wall. On the videotape of the incident, the plaintiff can be heard swearing at defendant Provencher and calling him names for approximately twenty seconds as he is being held against the wall of the dayroom by defendants Howard and Carroll. (*See* Def.'s Mem. Supp. Mot. Summ. J., Ex. D.) In response, defendant Provencher states that he considers the plaintiff to be making threats and to be non-compliant. (*See id.*) As defendants Howard, Caroll and Provencher begin to walk the plaintiff down to the restrictive housing unit, the plaintiff is quiet and remains quiet for over two minutes. (*See id.*) Defendant Provencher can be heard warning the plaintiff that if he continues to take it to the next level, he "will find out" and that he will be going on in-cell restraints due to his non-compliance. (*See id.*)**

**Before they reach the restrictive housing unit, approximately two minutes and forty seconds from the start of the videotape, the plaintiff begins to swear again and becomes upset as he verbally complains about the punishment that defendant Provencher is imposing for the extension cord that was found in vent space between his cell and Inmate Vivo's cell. (*See id.*) Defendant Provencher tells the plaintiff to keep running his mouth, accuses him of making idle threats and informs him that the incident involved a safety matter that put many people's lives at risk. (*See id.*) Defendant Provencher refuses to let the matter go. The**

plaintiff continues to swear and complain until they arrive at the restrictive housing unit. (*See id.*)

When they arrive at the restrictive housing unit, defendant Provencher directs defendants Howard and Carroll to place the plaintiff in a cell and then announces that a controlled strip-search will be performed because of the plaintiff's actions and threats. Defendant Provencher states that he is not comfortable releasing the plaintiff from restraints in view of the plaintiff's threats against him. (*See id.*) The plaintiff is led into the cell by defendants Carroll and Howard. Defendants Cavallo, Mastroianni and Cote then enter the cell and direct the plaintiff to get down on his knees next to the bed and place his upper body on the top of the bed. (*See id.*) Defendant Provencher directs the placement of defendants Carroll, Howard, Cavallo, Mastroianni and Cote in relation to the plaintiff. (*See id.*) Thus, a total of five officers and defendant Provencher are part of the strip-search. Defendant Provencher directs the actions of defendants Carroll, Howard, Cavallo, Mastroianni and Cote throughout the strip-search.

They begin by taking off the plaintiff's shirt and then proceed to take off his pants and under shorts. (*See id.*) When defendant Cavallo removes the plaintiff's under shorts, the plaintiff accuses him of sexually assaulting him. (*See id.*) The plaintiff then becomes verbally agitated and starts to swear and announce that he will be suing all the officers involved in the strip-search. (*See id.*) A female

health services employee then comes into the cell as the plaintiff is being dressed in an orange jump suit and asks the plaintiff if he is going to harm himself. The plaintiff replies no. (*See id.*)

After the plaintiff is completely dressed, all of the defendants leave the cell and remove the plaintiff's handcuffs through the slot in the cell door. They do not place the plaintiff on in-cell restraints. The same health services employee speaks to the plaintiff through the cell window about his mental and medical well-being. Due to the plaintiff's complaint of sexual assault, the health services employee informs him that she will be making a referral to the mental health department at Cheshire. (*See id.*)

Defendant Provencher issues the plaintiff a disciplinary report for violating safety and security and insulting language. He does not give the plaintiff a disciplinary report for threats. Correctional officials subsequently find the plaintiff guilty of both the interfering with safety and security charge and insulting language charge and impose various sanctions.

III. Discussion

The plaintiff claims that on June 2, 2010, the defendants subjected him to an unreasonable strip-search and sexually assaulted him during the search. The defendants argue that the controlled strip-search did not violate the Fourth

Amendment because it was reasonable under the circumstances and the claims of sexual assault do not rise to the level of an Eighth Amendment violation.[2]

A.   Controlled Strip-Search

Although inmates do "retain certain fundamental rights of privacy," *Houchins v. KOED, Inc.*, 438 U.S. 1, 5 n. 2 (1978), these rights may be restricted and retracted in order to "maintain[ ] institutional security and preserve[ ] internal order and discipline." *Bell v. Wolfish*, 441 U.S. 520, 546 (1979). In the prison context, the Fourth Amendment proscribes unreasonable searches of both pre-trial detainees and sentenced inmates. *See id.* at 558.

The Supreme Court has recognized that "correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Florence v. Bd. of Chosen Freeholders*, ___ U.S.___, ___, 132 S.Ct. 1510, 1517 (2012). Furthermore, correctional officials possess the professional expertise and experience to undertake "[t]he task of determining whether a policy is reasonably related to legitimate security interests." *Id.* (citation omitted). "In the absence of substantial evidence in the record to indicate that the [prison] officials have

---

[2] The court notes that an additional argument in the motion for summary judgment was based on the plaintiff's alleged failure to exhaust his available administrative remedies as all claims prior to filing this action. On June 21, 2013, the defendants moved to withdraw this argument. The court granted the motion to withdraw on June 28, 2013.

exaggerated their response to [] [legitimate security] considerations courts should ordinarily defer to their expert judgment in such matters." *Id.* (citing *Block v. Rutherford*, 468 U.S. 576, 584-85 (1984); *Bell*, 441 U.S. at 548).

The standard for determining the reasonableness of a search involves consideration of "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559. Courts have upheld strip-searches as reasonable security measures even when probable cause for the searches was absent as long as the searches were related to a legitimate penological interest. *See Florence*, ___ U.S. at ___, 132 S.Ct. at 1523 (strip-search procedures applied during intake process at prison facility to detainee arrested for minor offense was reasonably related to need of the prison facility to maintain security and did not violate Fourth or Fourteenth Amendments); *Bell*, 41 U.S. at 558-59 (holding visual strip-searches of inmates' body cavities after contact visits with person from outside facility to be reasonable in light of the "serious security dangers" in prison, together with "common occurrence" of the "[s]muggling of money, drugs, weapons, and other contraband"); *Covino v. Patrissi*, 967 F.2d 73, 79 (2d Cir. 1992) (holding prison procedure of subjecting inmates and pre-trial detainees to routine and random visual body cavity searches reasonably related to legitimate penological interests).

On the other hand, Courts have concluded that a strip-search or body cavity search that is unrelated to a legitimate penological purpose or is designed to intimidate, harass or punish the inmate is violative of the Fourth Amendment's proscription against unreasonable searches.  *See Hodges v. Stanley*, 712 F.2d 34, 35-36 (2d Cir. 1983) (second strip search performed soon after the first strip-search served no legitimate interest when prisoner was under continuous escort); *Hurley v. Ward*, 584 F.2d 609 (2d Cir. 1978) (affirming issuance of preliminary injunction that prohibited visual anal and genital searches of plaintiff without probable cause because "the gross violation of personal privacy involved in the . . . searches . . . especially in view of the physical and verbal abuse incident to the procedure far outweighed the evidence . . . at the preliminary hearing to justify the searches as a prison security measure."); *Jean-Laurent v. Wilkerson*, 438 F. Supp. 2d 318, 323 (S.D.N.Y. 2006) (second strip-search served no legitimate correctional interest because plaintiff had been under constant supervision since first strip-search and verbal and physical abuse of plaintiff during search suggested purpose of search was to harass and intimidate).

State of Connecticut Administrative Directive 6.7, entitled Searches Conducted in Correctional Facilities, defines a strip-search as "visual body cavity search which includes a systematic visual inspection of an unclothed person's hair, body cavities (to include the . . . ears, nose, mouth, under arms, soles of the

feet . . . between the toes, and rectum) and genitalia." (*See* Def.'s Mem. Supp. Mot. Summ. J., Ex. H, Admin. Dir. 6.7(3)(L)). A strip-search should be conducted out of view of those not involved in the search process and should not normally require physical contact by prison staff. (*See id.* at 6.7(5)). A strip-search of an inmate must be conducted "upon initial placement in a specialized housing unit, to include . . . administrative segregation . . . [and] restrictive housing." (*See id.* at 6.7(5)(A)(6)(a) and (h)).

      The parties do not contest the fact that subsection 5(A) of Administrative Directive 6.7 which requires that an inmate be strip-searched when he or she is placed in either administrative segregation or a restrictive housing unit is reasonable and valid. Issues of fact exist, however, as to whether the controlled strip-search conducted by the defendants was reasonably related to a legitimate penological purpose. Subsection (5)(D) of Administrative Directive 6.7 governs controlled strip-searches. It provides that prison staff may conduct a hands on, controlled strip-search of an inmate when he refuses to comply with a visual body cavity strip-search and in the interest of safety and security there is a valid penological reason to search the inmate. (*See id.* at 6.7(5)(D)). Prior to conducting such a search, prison staff must attempt verbal intervention in accordance with the verbal intervention provisions of Administrative Directive 6.5, Use of Force. If the initial verbal intervention is unsuccessful, prison staff

shall conduct a final verbal intervention prior to undertaking the controlled strip-search.  A custody supervisor must authorize and observe the controlled strip-search.  Both the final verbal intervention and controlled strip-search must be videotaped.  (*See id.*)

A controlled strip-search is achieved by using restraints or approved restraint techniques to maintain control of the inmate's body while prison staff systematically remove the inmate's clothing by hand.  "At all times, staff shall avoid physical contact with the genitals and rectum." (*See id.*)  Through a controlled strip-search, prison staff "shall only seek to observe all areas of the inmate's body to reasonably ensure the safety and security of the public, staff and inmates." (*See id.*)

Under Administrative Directive 6.5, entitled Use of Force, prison staff are required to attempt to gain the voluntary cooperation, control and compliance of the inmate when there is no immediate threat to staff, the inmate, others or the safety and security or order of the prison facility.  (*See* Def.'s Mem. Supp. Mot. Summ. J., Ex. I, Admin. Dir. 6.5(4)(B)).  A supervisor is required to "issue a last verbal warning to the inmate and advise the inmate that force shall be used to include, but not limited to chemical agents and/or canine, and provide the inmate with a reasonable amount of time to comply with lawful direction before initiating the use of physical force." (*See id.*)  If an inmate's behavior constitutes an

immediate threat to himself, others, property or the order and security of the facility, prison staff may use force or apply restraints immediately. (*See id.*)

With regard to the justification for initiating the controlled strip-search, the defendants contend that defendant Provencher was not required to make any attempts to verbally intervene before ordering the other officers to conduct the controlled strip-search because he felt the plaintiff's insulting language indicated that the plaintiff was out of control. It is undisputed that the plaintiff was escorted from the day room to the restrictive housing unit in handcuffs behind his back by two correctional officers and defendant Provencher. On the videotape, towards the end of the plaintiff's escort, he can be heard swearing, calling defendant Provencher names and complaining about the punishment he is receiving for conduct/contraband attributed to Inmate Vivo. (*See* Def.'s Mem. Supp. Mot. Summ. J., Ex. D.) Once the plaintiff arrives at the restrictive housing unit, however, he is calm and is not speaking in a threatening manner or resisting the officers who are escorting him. (*See id.*) As three officers lead him into the restrictive housing unit cell, defendant Provencher issues an order that a controlled strip-search will be performed because of the plaintiff's actions and threats. (*See id.*)

There is no indication on the videotape that the plaintiff refused to comply with an order that he undergo a visual body cavity strip-search or that he

disobeyed any other direct order.  Just before defendant Provencher orders the controlled strip-search, the plaintiff remains handcuffed behind his back with an officer holding each arm.  There does not appear to be any immediate threat to staff, the plaintiff or others or to the order or safety and security of the facility that would preclude attempts to verbally intervene with regard to conducting a visual body cavity strip-search of the plaintiff rather than a controlled strip-search.  The court concludes that based on the conduct, verbal remarks and demeanor of both the plaintiff and defendant Provencher on the video-tape of the incident that there are issues of fact as to whether it was reasonable for defendant Provencher to have ordered the controlled strip-search at all or to have conducted the controlled strip-search without first attempting verbal intervention.  *See Smith v. Taylor*, 217 F. App'x 97, 98 (2d Cir. 2007) ("we hold that there are material issues of fact as to whether the search was authorized by the directive or could have been reasonably perceived to be authorized by the directive").

Furthermore, the verbal remarks and conduct of defendant Provencher cause the court to question whether the controlled strip-search was undertaken with the intent to harass and intimidate the plaintiff rather than for a legitimate penological purpose.  The videotape reflects that Lieutenant Provencher told the plaintiff that if he continued with his verbal insults  "would find out" and also described the plaintiff's threats as idle threats, but then explained that the

plaintiff's threats required that he undergo a controlled strip-search. (*See* Def.'s Mem. Supp. Mot. Summ. J., Ex. D.) In addition, Lieutenant Provencher stated that he would issue the plaintiff a disciplinary report for threats, but never actually did so. Furthermore, Lieutenant Provencher can be viewed standing with one foot up on the bed leaning over the plaintiff during the strip-search and appears to be holding a can of pepper spray in his hand. (*See id.*)

With regard to the manner in which the strip-search was conducted, the plaintiff stated in his deposition that after the defendant officers removed his pants, defendant Cavallo grabbed his private parts, touched the crease between his buttocks and pressed on his anus. This conduct occurred for only a few seconds. The defendants do not contest these statements. The Administrative Directive specifically states that prison staff conducting a controlled strip-search "shall avoid physical contact with the genitals and rectum" at all times.

In addition, the plaintiff argues that the defendants permitted a female health services employee to come into the cell during the strip-search and viewed him when he was unclothed. The videotape does show a female health services employee come into the cell in which the strip-search is being conducted towards the end of the search while the Plaintiff was still unclothed. It is difficult to tell what the health services employee observed at that time, but it appears that she had the opportunity to observe the Plaintiff's nude body. Thus, there are issues

of fact as to whether the manner in which the controlled strip-search was conducted was reasonable.

It is evident that there are disputed issues of fact as to the factors to be considered in determining the reasonableness of the controlled strip-search performed by the defendants on the plaintiff. Thus, the motion for summary judgment is denied as to the Fourth Amendment claim against the defendants.

B.   Sexual Assault

The plaintiff alleges that Lieutenant Provencher ordered four correctional officers to physically hold him down, strip search him and pat him down in private areas. He accuses the defendants of sexual assault. The defendants argue that the plaintiff's claims fail to state a violation of the Eighth Amendment.[3]

---

[3] Although the defendants assume that the plaintiff's claim arises under the Eighth Amendment, the plaintiff asserts in his affidavit in opposition to the motion for summary judgment that he was a pretrial detainee at the time. In the case of a person being held as a pretrial detainee, the proscription against cruel and unusual punishment set forth in the Eighth Amendment does not apply "because as a pre-trial detainee [he or] she is not being punished." *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) (internal quotations marks and citation omitted). Instead, a person detained prior to conviction receives protection against mistreatment at the hands of prison officials under the Due Process Clause of the Fourteenth Amendment if held in state custody. *See Liscio v. Warren*, 901 F.2d 274, 275-76 (2d Cir. 1990) (applying Fourteenth Amendment to a state detainee). Thus, even if the Due Process Clause were applicable to the plaintiff, the established Eighth Amendment standard for claims of sexual abuse by prison officials would still be the appropriate standard for resolving the plaintiff's claims. *See Arnold v. Westchester Cnty.*, No. 09 Civ. 3727 (JSR)(GWG), 2012 WL 336129, at **10-11 (S.D.N.Y. Feb. 3, 2012) (applying Eighth Amendment standards to illegal strip-search claim of pretrial detainee); *Pine v. Seally*, No. 09 Civ. 1198(DNH)(ATB), 2011 WL 856426, at *3 n.12, 8 (N.D.N.Y. Feb. 4, 2011) (applying *Boddie* Eighth Amendment analysis to sexual abuse claim of pretrial detainee).

The Second Circuit has held that "sexual abuse of a prisoner by a correctional officer may in some circumstances violate the prisoner's right to be free from cruel and unusual punishment." *Boddie v. Schnieder*, 105 F.3d 857, 860-61 (2d Cir. 1997). To sustain an Eighth Amendment claim based on conditions of confinement, an inmate must meet both an objective and subjective prong. Objectively, the plaintiff must establish that he suffered a sufficiently serious deprivation of his basic human needs - e.g., food, clothing, shelter, medical care and reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (internal quotation marks and citation omitted). The deprivations must be examined in light of the contemporary standards of decency to determine whether they are sufficiently serious. *Id.* at 35-36; *Rhodes v. Chapman*, 425 U.S. 337, 347 (1981).

To meet the subjective prong, the plaintiff must show that the defendants acted with "more than mere negligence." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). The plaintiff must demonstrate that the defendant prison officials possessed culpable intent, that is, the officials knew that he faced a substantial risk to his health or safety and disregarded that risk by failing to take corrective action. *See id.* at 834, 837.

The Second Circuit recognized in *Boddie* that objectively "[s]exual abuse may violate contemporary standards of decency and can cause severe physical

and psychological harm" and "has no legitimate penological purpose." *Boddie*, 105 F.3d at 861 (citing cases).  Furthermore, "[w]here no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind." *Id.*  The Second Circuit affirmed the district court's dismissal of the plaintiff's claim for sexual harassment, however, because it found that the "small number of incidents in which [the plaintiff] was verbally harassed, touched, and pressed against without his consent" were not sufficient to constitute a constitutional violation under the Eighth Amendment.  *Id.*

The defendants argue that the pat down of the plaintiff's genitals was an isolated and insubstantial incident and did not constitute an objectively serious deprivation for purposes of an Eighth Amendment violation.  In his deposition, the plaintiff described the conduct of Correctional Officer Cavallo as follows: after the officers removed his pants, Officer Cavallo grabbed his private parts, touched the crease between his buttocks and pressed on his anus.  Officer Cavallo touched the plaintiff's private parts for only a few seconds.  (*See* Def.'s Mem. Supp. Mot. Summ. J., Ex. B at 16-17.)

The Court concludes that this brief instance of alleged sexual touching was not severe enough to constitute a serious deprivation of the plaintiff's life's necessities.  *See Boddie*, 105 F.3d at 861 (although "isolated episodes of

harassment and touching alleged by [plaintiff] are despicable and, if true . . . may potentially be the basis of state tort actions. . . . they do not involve a harm of federal constitutional proportions"); *Harry v. Suarez*, No. 10 Civ. 6756(NRB), 2012 WL 2053533, at *3 (S.D.N.Y. June 4, 2012) (allegation that prison officer "groped [inmate's] genitals, buttocks, and inner thighs for up to fifty three seconds in the course of a frisk" failed to state Eighth Amendment claim); *Morrison v. Cortright*, 397 F. Supp. 2d 424, 425 (W.D.N.Y. 2005) (allegation that correctional officer shone light up inmate's anus, ran his finger between inmate's buttocks causing inmate to urinate on himself, and rubbed his penis against inmate's buttocks during strip frisk insufficient to give rise to constitutional claim); *Montero v. Crusie*, 153 F. Supp. 2d 368, 373-75 (S.D.N.Y. 2001) (allegation that on several occasions, correctional officer squeezed inmate's genitals while pat-frisking him did not show sufficiently serious deprivation under Eighth Amendment standard, particularly when inmate did not allege that he was physically injured by such conduct). Accordingly, the plaintiff has failed to state a claim of a violation of his Eighth Amendment rights against the defendants. The motion for summary judgment is granted on this ground.

IV. Conclusion

The Motion for Summary Judgment [Doc. No. 28] is GRANTED as to the Eighth Amendment sexual assault claim and DENIED as to the Fourth Amendment strip-search claim.  The state law claims also remain pending.

SO ORDERED this 10th day of September 2013, at Hartford, Connecticut.

_____/s/_____
VANESSA L. BRYANT
UNITED STATES DISTRICT JUDGE